## UNITED STATES v. WOOLEN.

Circuit Court of Appeals, Sixth Circuit.
April 3, 1928.

No. 4805.

1. **Army and navy** ☞51½—Designated beneficiary of war risk insurance certificate, if living, would have been entitled to sue for unpaid installments, insured having died before bonus payment (Act July 2, 1926, § 18, adding § 309 to World War Veterans' Act 1924 [38 USCA § 516b]; Act Feb. 24, 1919, § 1406 [Comp. St. § 2165a]).

Under Act July 2, 1926, § 18, adding section 309 to World War Veterans' Act 1924 (38 USCA § 516b), insured's mother, designated as

25 F.(2d)—43

beneficiary of his war risk insurance certificate, if living, might have maintained suit to recover unpaid installments due on policy, where insured had allowed his insurance to lapse and died after February 24, 1919, before collecting the bonus provided by Act Feb. 24, 1919, § 1406 (Comp. St. § 2165a).

2. **Army and navy** ☞51½—Designated beneficiary in war risk policy held vested with all unpaid installments accruing before her death and title thereto passed under state laws to her successors (World War Veterans' Act, § 303, as revised June 7, 1924 [38 USCA § 514]).

Deceased soldier's mother, who was designated as beneficiary in his war risk insurance policy, had vested interest in all unpaid installments accurring before her death, and on her death such right passed under laws of Tennessee to her successors in title, but she had in remaining installments no interest which survived her death, and as respects such installments those entitled to her property in case of intestacy took nothing, under World War Veterans' Act, § 303, as revised June 7, 1924 [38 USCA § 514]).

3. **Descent and distribution** ☞52(3)—Under Tennessee law, surviving husband takes deceased wife's personalty under common law, by jus matrimonii.

Under Tennessee law, a surviving husband takes absolutely the personal property of deceased wife, not by descent or distribution, but under common law, by jus matrimonii.

4. **Army and navy** ☞51½—Surviving husband of deceased, designated beneficiary in war risk policy, is not entitled to payments accruing after her death (World War Veterans' Act, § 303, as revised June 7, 1924 [38 USCA § 514]).

Under World War Veterans' Act, § 303, as revised June 7, 1924 (38 USCA § 514), where designated beneficiary of war risk insurance policy died before all installments had been paid, beneficiary surviving husband could not recover unpaid installments accruing after her death, in absence of showing that he was official representative of her estate.

5. **Army and navy** ☞51½—Statute restricting persons to receive payment of war risk insurance held not applicable to policies designating beneficiaries (38 USCA §§ 516, 516b).

Provision of Act July 2, 1926, § 16, amending § 305, Act June 7, 1924 (38 USCA § 516), that war risk insurance "hereafter revived under this section and section 309 (38 USCA § 516b), by reason of total disability or by death of insured, shall be paid only to insured, his widow, child or children, dependent mother or father, and in the order named, unless otherwise designated by insured during his lifetime or by his last will and testament," so far as it imposes restriction on payment of unpaid installments to persons named therein, should be confined to nondesignate policies.

6. **United States** ☞110—Ordinarily government does not pay interest, unless fairly required by contract or statute.

Ordinarily the government does not pay interest, unless fairly required by contract or statute.

**7. Army and navy ⬤⟿51½—Statute held to provide for interest on unpaid installments of insurance, revived by application of unpaid bonus to premiums, and judgment bore interest at same rate (Act July 2, 1926, § 18, adding § 309 to World War Veterans' Act 1924 [38 USCA § 516b]).**

Act July 2, 1926, § 18, adding section 309 to World War Veterans' Act 1924 (38 USCA § 516b), providing that war risk insurance of any person who has allowed his insurance to lapse and has died after February 24, 1919, and prior to collecting his bonus, shall not be considered as lapsed during period which uncollected bonus would, if applied to payment of premiums when due, equal or exceed amount thereof, and directing Veterans' Bureau to pay his beneficiaries "amount of said insurance, less the premiums and interest thereon at 5 per centum per annum, compounded annually, in installments, as provided by law," *held*, to entitle beneficiaries to interest on unpaid installments of insurance withheld for several years, and judgment recovered on policy bore interest at same rate.

**8. Interest ⬤⟿38(2)—Judgments bear interest at same rate as obligation sued on.**

The general rule is that judgments bear interest at same rate as obligation sued on.

In Error to the District Court of the United States for the Western District of Tennessee; Harry B. Anderson, Judge.

Action by William Henry Woolen against the United States. Judgment for plaintiff, and the United States brings error. Judgment vacated, and case remanded, with directions.

J. M. Nixon, of Nashville, Tenn. (Lindsay B. Phillips, U. S. Atty., and W. H. Fisher, Asst. U. S. Atty., both of Memphis, Tenn., William Wolff Smith, Gen. Counsel U. S. Veterans' Bureau, of Washington, D. C., and J. M. Nixon, Regional Atty., of Nashville, Tenn., on the brief), for the United States.

Samuel A. Godsey, of Memphis, Tenn., for defendant in error.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

DENISON, Circuit Judge. As a private in the army, Rayfield Woolen, in October, 1918, received a certificate in the usual form for $10,000 war risk insurance, payable in case of his death in monthly installments of $57.50 until the principal sum, with certain interest and additions, was exhausted. His mother, Betty Woolen, was by his application designated as beneficiary. He died March 26, 1919. His mother having later died, this suit was brought in the court below by William Henry Woolen, describing himself as surviving husband of Betty Woolen. A judgment was rendered in plaintiff's favor for the full amount due on the policy, above certain payments which had been made. The United States brings error.

1. The case was tried before the District Judge, pursuant to written waiver of jury. There was no formal finding of fact, nor any exception to the judgment on the ground that it was not supported by any evidence. If this were all, there would be nothing for us to review. However, the parties made and filed a stipulation, covering many of the facts, and the court in its memorandum opinion says: "The facts in this case are set forth in the stipulation between the parties as follows: [Quoting this stipulation.]" The stipulation also referred to certain exhibits, and, although awkwardly, probably intended to make them a part of it. Under these circumstances, and while the stipulation is not complete, the case comes so near to a submission on agreed facts that we prefer to consider the questions which the record reveals.

2. It was the theory of the pleadings and of the stipulation, and of the Director of the Bureau, that the soldier did not pay his premium for January, 1919; that the time for the payment expired January 31st and that the 31 days of grace expired March 3d; and hence the Bureau claimed that, on this date, the policy became forfeited, and was not in force when the soldier died on March 26th. When the papers in the case (the exhibits to the stipulation) were produced on the trial, they showed that the soldier was not discharged until January 4, 1919, instead of in the previous December, as had been supposed. It is stipulated that, under the applicable regulations, the premium each month was being deducted from the soldier's pay. It is therefore now argued that the settlement with him on January 4th, when he presumptively was paid whatever balance there was, would have included a deduction of the January premium, and that hence the policy would not have become forfeited until March 29th. In view of the fact that the soldier and his mother and father (plaintiff) were negroes, illiterate and poor, and that the defendant was in the sole possession of all the records showing the facts, there is much to be said in favor of the inference now urged that the nonpayment of the January premium did not sufficiently appear; and the stipulation that the only legal question in the case was the one arising upon such nonpayment is an agreement to which we would not be inclined to hold the plaintiff with great strictness. However, we prefer to pass by

this question also, and take up what have been thought to be the merits.

3. Accepting the theory that there was default in the January premium, yet the policy still continued in force on February 24, 1919. On that day, Congress passed the so-called Bonus Act (40 Stat. p. 1151 [Comp. St. § 2165a]), pertinent parts of which are quoted in the margin.[1] The War Risk Insurance Act, as amended October 6, 1917 (40 Stat. p. 399), provided, in section 13 (Comp. St. § 514kk), "that the Director * * * shall administer, execute, and enforce the provisions of this act, and for that purpose have full power and authority to make rules and regulations, not inconsistent with the provisions of this act, necessary or appropriate to carry out its purposes, and shall decide all questions arising under the act." [2] Section 404 provided (40 Stat. 410 [Comp. St. § 514vv]) that "regulations shall provide * * * the time and method of payment of the premiums thereon, but payments of premiums in advance shall not be required for periods of more than one month each and may be deducted from the pay or deposit of the insured or be otherwise made at his election." Pursuant to these statutes, the Director had made a regulation (Bulletin No. 1, par. 7, Oct. 15, 1917) that "premiums shall be paid monthly on or before the last day of each calendar month and will, unless the insured otherwise elects in writing, be deducted from any pay due him from the United States, or deposit by him with the United States, and if so to be deducted, the premiums when due will be treated as paid whether or not such deduction is, in fact, made, if upon the due date the United States owe him on account of pay or deposit an amount sufficient to provide the premium." The soldier, in his insurance application, had said: "I authorize the necessary monthly deductions from my pay, or, if insufficient, from any deposit with the United States, in payment of the premiums as they become due."

There are references in the regulations to payment of premiums out of deposits, and there are regulations for the accumulation of such deposits to the credit of the soldier; but all consideration of the subject of deposits may be omitted, because it is not claimed that this soldier had any "deposit" out of which payments could be made.

After the beneficiary, the mother, had made claim to the Bureau for this insurance, the Director, in May, 1920, ruled that this soldier's $60 bonus, which had become due to him during his lifetime, was "pay" which should be applied to the premiums, and hence that the policy was not in default. The Director accordingly made an award, and payments were made to her, covering the period from the soldier's death until November, 1920. It does not appear whether this holding of the Director was embodied in any formal regulation; but the question is obviously one that could have arisen in a considerable number of cases, and, whether by regulation or by prevailing practice, it is clear that the question was decided by the Director in favor of the validity of such a policy.

In November, 1920, the Comptroller General ruled in some other case that this bonus was not "pay" which could be thus applied against insurance premiums. The Director of the War Risk Bureau accepted this ruling, refused to make further payments to Mrs. Woolen, and demanded a repayment of what she had received.

There are many considerations tending to persuade that the question whether the bonus should be applied to pay premiums otherwise in default was so far a matter of methods and means of payment to be fixed by the Director as to be covered by the power to "decide all questions arising under this act," and hence that the Director's decision finding these premiums to have been satisfied out of the bonus was the end of the matter. Also it can be forcibly argued that, if the question was one of law as to the meaning and effect of the bonus statute, the Director's construction was right, and the bonus was "pay" applicable to the defaulted premiums. However, there are reasons tending to support the contrary view;[3] and as we consider a decision by us to be now unnecessary, we attempt no discussion nor conclusion on this point.

[1] 4. The question presented in the last paragraph has become moot by the effect of the Act of July 2, 1926 (44 Stat. p. 800, §'

---

[1] "Sec. 406. That all persons serving in the military or naval forces of the United States * * * who have, since April 6, 1917, * * * been discharged under honorable conditions * * * shall be paid, in addition to all other amounts due them in pursuance of law, $60.-00 each. * * * The above amount, in the case of separation from the service on or prior to the passage of this act, shall be paid as soon as practicable after the passage of this act. * * * The amounts herein provided for shall be paid out of the appropriations for 'pay of the army' and 'pay of the navy' * * * by such disbursing officers as may be designated."

[2] Except that in certain cases the beneficiary might bring suit. Section 405, 40 Stat. p. 410.

[3] See Judge Westenhaver's opinion in Crawford v. United States (D. C.) 291 F. 801.

309 [38 USCA § 516b]),[4] which expressly provides that under such circumstances as here happened,. the insurance should not be considered as lapsed, and that the Bureau is directed to pay to the beneficiary the amount of the insurance. This section as a whole does not purport to create a new liability. It declares that during the period while the $60 would pay the premiums, the policy "should not be considered as lapsed." Its only practical effect, in a situation where a suit had already been brought upon such a policy— if it could not be taken advantage of to maintain that suit—would be to require dismissal of that suit and the bringing of another one for the same thing. In that situation, the application of this new statute would be so far a matter affecting only the remedy that we do not doubt its effect to save a pending suit, if such suit needed saving; and hence we conclude that, under favor of this statute, Betty Woolen, if living, might thereafter have maintained her original suit.

[2] 5. The mother, the beneficiary named, had the right, under the law as it stood when the soldier died, to bring a suit · upon this policy, as she did, to take the judgment of the court. She died in November, 1922, with the suit pending. The nature of the right of a named beneficiary, as affected by · his death after the death of the insured, is fully considered and the pertinent certificatory and statutory provisions quoted, in our opinion in Reivich v. U. S. (C. C. A.) 25 F.(2d) 670, this day filed. From that review, as applicable here, we conclude that Betty Woolen at her death had a vested interest in those installments which had then become payable, being those for a period of substantially two years, which right would pass under Tennessee laws to her successors in title, but that she had in the remaining installments no interest which survived her death, and that, as

to those future items, those entitled to her property in case of intestacy took nothing.

It is perhaps not clear that section 15 of the act of 1919 (41 Stat. 376 [Comp. St.' § 514vv(1)]), in force when she died, applies to this case, because, though an award had been made to Betty Woolen, it stood revoked when she died; yet this section is in any event not important with reference to the nature of her interest when she died, because here, just as in the Reivich Case, the provisions of the original contract, fixed by the regulations and the certificate, were the same as those of this section 15. It is also true that the act of 1926 expressly directs the payment "to his beneficiaries under said policy"; but this refers, we think, generally to those persons who by law would be beneficiaries if the policy had been kept in force, and should not be interpreted as referring specifically to the named beneficiary, so as to make an abnormal disposition of the proceeds of these once delinquent policies.

[3] 6. It seems to be the Tennessee law that the surviving husband takes absolutely the personal property of the deceased wife, not by descent or distribution at all, but under the common law, by jus matrimonii. Baker v. Dew, 133 Tenn. 136, 179 S. W. 645. Hence the plaintiff's right to maintain this suit and recover the amounts which had become due to Betty Woolen before her death is clear, unless it is for the effect of section 303, as amended March 4, 1925 (43 Stat. 1310' [38 USCA § 514]), and as affected by the amendment to section 305 by the Act of July 2, 1926 · (44 Stat. 799, 800 [38 USCA § 516]), to be later considered.

[4] 7. Although the denial of plaintiff's right to sue for installments payable after the mother's death is the necessary conclusion following from the discussion in the Reivich Case, yet the subject may be ' followed further with reference to the particular facts here involved. In section 303, as revised June 7, 1924 (43 Stat. 625), a provision is made which is intended to refer to situations where the surviving beneficiary dies before receiving all payments and which directs that the present value of the remaining installments then be paid to the estate of the insured. This revised' section 303 could seemingly have no effect to make the estate the beneficiary in this case, if this policy had continued in force; and this is true because the operation of the section is made contingent upon the fact that "there being no surviving person within said permitted class," while here the father, a person within the permitted

---

[4] "Sec. 18. That a new section be added to the World War Veterans' Act, 1924, approved June 7, 1924, to be known as section 309, and to read as follows:

" 'Sec. 309. Where any person allowed his insurance to lapse and died after February 24, 1919, and prior to collecting the $60 bonus provided by the Act of February 24, 1919 (Fortieth Statutes at Large, page 1151), then and' in that event his insurance shall not be considered as lapsed during such period as said uncollected bonus would, if applied to the payment of premiums when due, equal or exceed the same, and the United States Veterans' Bureau is hereby authorized and directed to pay to his beneficiaries under said policy the amount of said insurance, less the premiums and interest thereon at 5 per centum per annum, compounded annually, in installments, as provided by law.' "

class, did survive. Hence it may be that the effect of this section at the time of its passage—because it was intended to cover the general situation but did not reach this case—was to restore the status fixed by the original statute of 1917 (section 402 [Comp. St. § 514uuu]) before the form of the policy was fixed by regulation, and thus, in cases like this, to indicate that the surviving beneficiary, and his estate after his death, would receive all the payments.

However, no steps were taken by the Bureau and no change in the relationship of these parties occurred between the adoption of this revised section on June 7, 1924, and its amendment on March 4, 1925. By this amendment the section was made to read as quoted in the margin.[5] There are ambiguities in this section, but none are suggested which may apply to this case, except reference to the last payment made under an existing award. There was here, after November, 1920, no existing award; but we observe that the section plainly applies at once to cases where upon the insured's death there is no surviving designated beneficiary, and where, therefore, there could have been no award prior to the incidence of this statute. Hence this specific provision as to the date of computing present value can be intended to apply only to the cases where there was an existing award, leaving other cases without specified computation date.

We are thus confirmed in concluding that this amended section 303 controls all installments which became payable after Betty Woolen's death, and that the plaintiff, as surviving husband and in her right, cannot recover therefor. If he is in fact the sole person within the permitted class interested in the estate of the insured, that will appear when proceedings are had to make him the official representative of the estate; but it does not appear by this record.

8. As pointed out in the Reivich opinion, this section 303 does not take effect upon those installments which have become payable before the beneficiary's death; they continue payable to the estate or representative of the person in whom the right to them had vested; only those "thereafter payable" are controlled by this statute.

[5] 9. Then we come to the effect of the amendment to section 305 of the Act of July 2, 1926 (44 Stat. 799, 800).[6] Under this clause it is argued that if the policy is to be treated as one which had lapsed excepting for the application of the bonus directed by section 309 (also part of this same Act of July 2, 1926), then all interests accruing by virtue of that so-called revival act were payable, not to Betty Woolen or her successors in title, but were payable to the widow, etc.

The language is blind enough; read literally, as applied to this case, it is "that insurance hereafter revived under * * * section 309 by * * * the death of the insured, shall be paid only," etc. How insurance could be "hereafter revived" by the "death of the insured" is a problem beyond the ordinary scope of mere interpretation. To get at the probable intent, we may consider sections 305 and 309 separately. Each alike was a new section added by the act of 1926, and each alike pertained to insurance which prima facie had lapsed because the soldier had not paid the premiums. Otherwise, they are distinct. Section 309 depended on the equitable offset between unpaid bonus and unpaid premiums. Section 305 depended on compensation for disability. It provided that in instances where the policy had seemed to lapse for nonpayment of premiums, but where the insured, at his death or total disability, had enough partial disability compensation due him to offset the premiums, even though compensation had never been claimed and any right to it was unknown, the offset should be considered as made, and the policy considered as not lapsed, so long as the compensation was enough to pay the premiums.

Rewriting this proviso in section 305, according to our views as to what Congress probably intended, it would say that upon all insurance liability which hereafter matures, by death or by total disability, and which then depends for its validity upon the reviving effect of this section, or 309, the proceeds shall be paid only as directed.

---

[5] "Sec. 303. If no person within the permitted class be designated as beneficiary for yearly renewable term insurance by the insured either in his lifetime or by his last will and testament or if the designated beneficiary does not survive the insured or survives the insured and dies prior to receiving all of the two hundred and forty installments or all such as are payable and applicable, there shall be paid to the estate of the insured the present value of the monthly installments thereafter payable, said value to be computed as of date of last payment made under any existing award. * * * This section shall be deemed to be in effect as of October 6, 1917."

[6] "Provided that insurance hereafter revived under this section and section 309, by reason of permanent and total disability or by death of the insured, shall be paid only to the insured, his widow, child or children, dependent mother or father, and in the order named unless otherwise designated by the insured during his lifetime or by last will and testament."

With section 305 there was opportunity to distinguish between claims which had already matured by death, and which were therefore, ipso facto, then and there revived by the statute, and those which should thereafter mature. In 1926 this kind of insurance was continuing in force as to a great part of the army then in the service. Partial compensation was continually becoming due, and policies were constantly lapsing for nonpayment of premiums, and the section would have a continuing future effect. It was not unreasonable to make a distinction between claims already matured, in which the rights of all parties interested had become relatively fixed, and future claims; and this distinction seems to be clearly expressed by "hereafter revived." It is, of course, not impossible that the use of the word "hereafter" was a mere blunder; but we do not see how we can assume any reasonable meaning for the words "hereafter revived * * * by the death of the insured, * * *" excepting that which we have given.

The Congressional Record shows that this proviso was perfected in section 305, without any reference to section 309, and that then by amendment the words "or in section 309" were inserted. It was not observed that they were inappropriate because practically all, if not all, the reviving effect of section 309 had been exhausted by deaths occurring within a year or two after 1919 (see note 7, infra), and there never would be any revivor (through unpaid bonus) by deaths occurring after July, 1926. It follows, we think, that, even if any intelligent application of this language can be made under section 305, it cannot be under section 309.

There is another reason why section 305 did not forbid Betty Woolen, and does not forbid this plaintiff, to recover payments due before November, 1922. Payment is confined to a newly limited permitted class, "unless otherwise designated by the insured in his lifetime," etc. Woolen had "otherwise designated," specifying his mother. It is contended that this "unless" clause refers only to the specified order of priority in the just created and newly limited permitted class. This is grammatically possible. It is equally possible that the clause refers to and modifies "shall be paid only to." We think the latter the more reasonable construction.

In this legislation Congress was dealing with a class of policies which perhaps technically had lapsed, but which equitably had not, and which Congress therefore said should not be deemed to have lapsed. Since between 1919, when the bonus was awarded,

and 1926, when this act was passed, any normal premium payments would long before have exhausted the $60, Congress was obviously dealing, as to insurance, with policies which in 1926 had ceased to be a liability, unless they had been matured by death within a short period after 1919.[7] Using the present case as an illustration, the soldier had rightfully designated his mother. After his death an award had been made to her, and she had been paid some installments, and others had become due to her, if the policy is to be deemed as not having lapsed. It is not easily conceivable why Congress, as a condition of doing what it thought was plain justice as to this policy, should intend to take these past-due payments away from her, if living, or from her successors, if dead, and give them to some one else. It seems to us that the natural inference is the other way, and that the new disposition of these policies was to be made only in cases where the soldier had made no disposition (or, perhaps, where his disposition had failed and the law must designate). With this construction the proviso "unless otherwise designated" has full opportunity for application. If construed to contemplate only a designation among the newly permitted class, first created in 1926, and referring as it then would to designations made long before 1926, it would contemplate a discretion exercised by the soldier during his life under an option created after his death. This is unreasonable. We are satisfied that the restrictive effect of "shall be paid only to" should be confined to nondesignate policies.[8]

[6, 7] 10. The question remains as to interest. The ordinary rule, that the government does not pay interest unless fairly required by contract or statute, is not to be doubted, although the rule is not so strictly applied as formerly. Phelps v. U. S., 274 U. S. 341, 47 S. Ct. 611, 71 L. Ed. 1083, and see Standard Co. v. U. S., 267 U. S. 76, 79, 45 S.

---

[7] There may have been occasional instances, in 1926, in which the bonus had gone uncollected for seven years, and in which the past-due premiums would then be less than $60; but they could not have been typical.

[8] In the Congressional Record to which we are referred (volume 67, pp. 12089–12093) we find nothing indicating any intent to divest the claims of a designated beneficiary. Under existing laws, the proceeds, where there was no effective designation, would go (lacking closer heirs) to the next of kin, though distant—"scattered all over Europe" and "whom the soldier never heard of." This was thought unduly generous; but these comments indicate no desire that the money should not go to a close relative who had been properly designated.

Ct. 211, 69 L. Ed. 519; White v. U. S., 270 U. S. 175, 180, 46 S. Ct. 274, 70 L. Ed. 530. For the purposes of this case, we are assuming that the interest subject is governed by the statute of 1926, which directs interest—on something—at 5 per cent., compounded annually. Grammatically, there is ambiguity whether this interest is to be computed upon the installments of insurance from the time when they would have become payable under the terms of the policy save for the assumed lapse, or upon the premiums. The underlying theory of the new section 309 plainly is that the bonus money had been equitably applicable to prevent the lapse of policies, so long as the amount would have kept them alive. It is something of a misnomer to speak of these policies as lapsed and revived; the theory of the new law was that they should have been kept in force, and hence they should be treated as having been kept in force; in that we see no "generosity."

In 1926 the beneficiaries of policies like this (taking this case as typical) had been deprived of their money for six years by what Congress recognized as an inequitable ruling. That they should receive interest on the payments of which they had been thus deprived was obviously just. Accordingly we find section 309 saying that the Bureau is directed to pay to the beneficiaries "the amount of said insurance, less the premiums [,] and interest thereon at 5 per cent. per annum compounded annually, in installments as provided by law"; or, rearranging the words in clearly better form, the direction is to pay "the amount of said insurance in installments, as provided by law, less the premiums, and interest thereon at 5 per centum per annum, compounded annually."

The ambiguity remains as to whether the interest is to be paid upon the installments or upon the premiums. We think the former the more reasonable meaning. The statute expressly excludes from its benefits any case where the soldier had received the bonus money. There was no reason for penalizing the soldier with interest upon the premiums, when the premium money had all the time been in the government's other pocket. No such intent ought to be ascribed to Congress if any other construction is open. Interest should be computed on the installments.

[8] If this conclusion as to interest is correct, it follows that the judgment should bear interest at the same rate. It is the general rule that judgments bear interest at the same rate as the obligation sued on, and, once the exemption of the government from inter-

est is removed by statute, the judgment should not change the situation.[9]

11. We are told that in two respects our conclusions are inconsistent with the established practice of the Bureau, and that under the familiar rule the departmental interpretation should be adopted. The first of these matters is as to the effect of the "unless otherwise designated" clause upon section 305. The Bureau has considered that this refers to a right to select as between the beneficiaries named in this section. There was certainly no established practice on this subject at the time of the passage of section 305, because that section created the situation. In so far as such a practice has since grown up, we do not think it sufficient to change the conclusion otherwise reached.

The other matter is as to the payment of interest. It is said that the Bureau never pays interest. This is very well as to the ordinary case where there is no specially applicable statute and where there is no delay in recognizing and paying the claim except that reasonably incidental to orderly administration. For the reasons above pointed out, claims under section 309 have unique position. Congress might well intend, as we think it did, to distinguish between these claims and the general type. Here again, there was no established practice as to interest on these policies in July, 1926, in recognition of which Congress may be supposed to have acted. Here again, we think the interpretation adopted by the Bureau does not justify its right to prevail.

12. The record in this court will be amended, by including the certified copy on file of the judgment below, which had been by error omitted from the transcript. We have stated herein some facts not expressly found in the stipulation, but which, either by the exhibits or by unchallenged explanations on the argument, we feel justified to regard as agreed facts. If we are in error in any such particular, counsel will advise us, within the time allowed for rehearing.

The judgment will be vacated, and the case remanded for entry of a new judgment

9 Section 19 (43 Stat. 612 [38 USCA § 445]), authorizes a suit like this, and says that "the procedure" shall be the same as that provided in the Act of March 3, 1887 (now sections 761–765, tit. 28, U. S. Code [28 USCA §§ 761–765; Comp. St. §§ 1574–1578]). Section 765 directs interest at 4 per cent. in judgments rendered thereunder. The reference in section 761 to 765 indicates that the latter is a procedural section, but the inference that this judgment should carry 4 per cent. interest is too uncertain for adoption.

for all monthly payments accrued until the death of Betty Woolen, with interest at 5 per cent., compounded annually, from the maturity of each payment, and the statutory attorney fee thereon, but without other costs, all with interest at 5 per cent. after judgment until paid. The United States being a party to this review, no costs in this court are awarded.